

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | | |
|---|---|---|---|
| RAMON MENDOZA, | § | | No. 08-13-00293-CR |
| | Appellant, | § | |
| | | | Appeal from the |
| v. | | § | |
| | | | 34th District Court |
| THE STATE OF TEXAS, | | § | |
| | | | of El Paso County, Texas |
| | Appellee. | § | |
| | | | (TC# 20130D01615) |
| | | § | |

**O P I N I O N**

In this domestic violence case, the victim testified on behalf of the assailant. Despite this testimony, Appellant Ramon Mendoza was convicted of aggravated assault with a deadly weapon and aggravated kidnapping. On appeal, Appellant contends the trial court abused its discretion in allowing the State's expert on domestic violence to testify. Appellant also contends the trial court abused its discretion in refusing to grant a mistrial when the State purportedly commented on his failure to testify. Finally, Appellant argues the combined effect of cumulative errors requires reversal. We conclude the trial court did not abuse its discretion and there was no cumulative error. Accordingly, we affirm.

**BACKGROUND**

Appellant and Ashley Thomas are partners.[1]   They live together in a recreational vehicle and are the parents of two children.   An eyewitness, Denise Davila, lives nearby.   Late one evening, Denise heard screams outside her home.   When she stepped outside to investigate, Denise saw Appellant in her yard on top of Ashley, who was on the ground.   Appellant was repeatedly hitting, kicking, and kneeing Ashley with enough force to render her unconscious. Denise pleaded with Appellant to stop and threatened to call the police, and at one point, attempted to take Ashley away, but Appellant picked up Ashley by her hair and dragged her away.   From photographs of the scene, Denise identified Ashley's blood and hair on the ground.

Denise called 911, and the recording of that call was played for the jury.   Denise informed the 911 operator that Appellant was beating his wife, had knocked her out, and had dragged her away next to where his property was located.   Denise stated there were blood stains in her yard, which she referred to as "a pile" of blood, and expressed concern that Appellant was going to continue "beating the crap out of her."

When El Paso County Sheriff's Office deputies arrived to investigate, they found the door to Appellant's home open and the residence empty.   In an effort to find Appellant and Ashley, they tracked footprints and found drag marks leading into the desert.   A U.S. Border Patrol helicopter was utilized to locate Appellant and Ashley.   Sensors on the helicopter detected a human-sized heat signature in the desert, and Appellant was soon located.   When asked by a deputy where Ashley was, Appellant claimed to be alone.   A short time later, Ashley's heat signature was detected approximately 25-30 yards from where Appellant had been found.   When Ashley was found, she was conscious but unable to communicate and appeared to be in pain. Ashley's clothing was bloody and stained with urine, her eyes were swollen shut, and her lips and

---

[1]  Ashley testified that she was not officially married to Appellant because he is married to someone else.

face were swollen.

The emergency room physician who treated Ashley testified that as a result of the assault, Ashley sustained numerous injuries, including a skull suture fracture near her left cheekbone, a large scalp hematoma involving the collection of blood against the skull, a fracture of a lumbar vertebra in her spine, a displaced rib fracture, and lacerations. According to the physician, significant force was required to break Ashley's skull. She testified that the major force required to displace Ashley's lumbar vertebra constituted assault with a deadly weapon with an intent to seriously harm. Trauma caused the bleeding in Ashley's skull, and the lacerations Ashley suffered caused permanent scarring. The amount of swelling in Ashley's face created a substantial risk of death, and an airway watch was instituted in case Ashley stopped or developed difficulty breathing. The ER physician opined the amount of force required to inflict Ashley's injuries rendered the fists, knees, and legs utilized in inflicting those injuries a deadly weapon.

The State introduced into evidence a recording of a jailhouse telephone call Appellant made to Ashley.[2] In the call, Appellant asked Ashley if she's "got [his] back," and instructed her to call his lawyer and execute a non-prosecution statement. Appellant instructed Ashley concerning what she should put in the non-prosecution statement to let them know "it wasn't [him]" but that "what everyone saw was a misunderstanding." Appellant instructed Ashley to convince Denise to support her, in part by telling Denise that she was going to leave Appellant "for a year to see if he straightens up" and that she wants to buy a car with the funds Appellant's friends would otherwise pay for his bond, and by telling Denise that Ashley, rather than Appellant, will give Denise and her brother Ivan $1,500 of Appellant's bond money to share if they will first "say

---

[2] Appellant made the call through an intermediary, whom he asked to get Ashley so Appellant could talk to her. Appellant told the intermediary that Ashley's "got my back."

the truth."[3]   He directed Ashley to ask Denise and Ivan "to say that they are sorry," that "they thought they were helping out," but that they "just don't want somebody to get in trouble like that." Appellant instructed Ashley to ask Denise, "Why should we bail him out when we can keep this fucking money . . . and you made a mistake?"   Appellant explained to Ashley, "We're just pimping [Denise's] ass" and that "since they're greedy, I believe they'll go for that."[4]   During the telephone conversation, Appellant never offered any apology to Ashley, indicated any remorse, or indicated a need or desire for rehabilitation.

Detective Jerome Washington visited Ashley in the hospital to obtain information for an emergency protective order, but she would not cooperate with him regarding the prosecution of Appellant.   Denise Davila testified that Ashley later told Denise that she was going to leave Appellant, asked Denise to not testify at Appellant's trial, and specifically told Denise that if she did not testify, Ashley would "pay off the warrant for [Denise's] arrest" that would otherwise issue as a result of Denise's failure to attend Appellant's trial.

Ashley testified as a defense witness for Appellant.   She claimed she had been unfaithful to Appellant,[5] and on the day of the attack, she had accused Appellant of being unfaithful to her and had thrown a soda can at a window, breaking it.   She claimed that Appellant left and went to Denise Davila's trailer.   Ashley then became upset when she heard them laughing, and she went to Denise's trailer and confronted Appellant.   They began screaming at each other, and Appellant

---

[3]  In the recording, Appellant refers to Denise Davila as "She Man" and her brother Ivan Davila as "Big Nose."

[4]  Detective Jerome Washington testified that during jailhouse phone calls, nicknames are used, code words are used to describe illegal acts, and street slang is used as "another way of saying something that you may not want to have out in the open[.]"   He explained Appellant's use of street slang in his telephone conversation with Ashley, including his use of the phrases "back us up" as an indication that everyone was going to be supporting Appellant, and "tell the truth" as an indication to not tell the truth.

[5]  On cross-examination, Ashley admitted she had informed Appellant's counsel that she had not been cheating on Appellant.

4

hit her in the stomach with his fist, and hit her in the face three or four times, after which she fell to the ground. Appellant then kicked her two times in the ribs before she became partially conscious. Ashley denied that Appellant had grabbed her by the hair and dragged her to the desert, and testified that she did not know whether it was her hair displayed in the photograph of Denise's yard.

Ashley testified that she heard Denise screaming and someone else say, "Call 911," and "that's when I took the privilege of my own needs to start running … [t]owards the desert." Ashley said she ran because she was scared for her husband who had never done anything violent to her. She explained that Appellant followed her to the desert, and they ran a long way, repeatedly falling down and getting up again. She denied Appellant had assaulted her, abducted her, or held her in the desert, and noted that Appellant had held her in an attempt to comfort her. Although she told Appellant to run and hide because she was scared he would be in trouble, Appellant stayed by her side and wrapped his sweater around her.

Ashley acknowledged that "no one deserved what [I] got that night," but asserted she had provoked Appellant. Ashley attributed the scars on her face to a canoeing accident, scratches from her children, and an injury from her childhood. She attributed two other scars to Appellant, but did not consider her face to be disfigured. Ashley stated that none of her injuries had affected her daily life and said she feels no pain. Ashley denied she was caught in the grip of a cycle of family violence.

Under cross-examination, Ashley agreed she had told multiple versions of the events to multiple people. She had informed one deputy that she had been "jumped" by two people. She had informed Detective Washington that Appellant had not assaulted her but had been in the desert

5

looking for her after she had been assaulted by unknown individuals. She admitted that she had initially told Detective Washington that Appellant had assaulted her by punching her several times and had caused her to lose consciousness. But, she testified that statement had been false. Ashley admitted that she had stated to the District Attorney's office that she would not say anything incriminating against Appellant.

Ashley testified she is a ninth-grade drop-out with no job and no family nearby, and said she was very scared for Appellant, the father of their children. Despite her injuries, Ashley claimed she had been able to run and had taken Appellant over a mile into the desert at night because she was concerned that Appellant would possibly go to jail. Ashley acknowledged that Appellant did not seek treatment for her, even after the helicopter located them in the desert, and explained that, despite needing treatment, she did not yell for help because she was scared for Appellant. Ashley admitted Appellant told her to sign a non-prosecution statement, and to approach Denise and Ivan Davila about their testimony, but denied he told her to lie about the incident.

## DISCUSSION

### Expert Witness Testimony

At trial, the State called Stephanie Karr, the Executive Director for the Center Against Family Violence, as an expert witness on family violence. Over objection, Karr was allowed to testify in general concerning the cycle of family violence and the reasons why victims of family violence often deny the abuse, stay with the abuser, and refuse to testify. During her testimony, Karr readily admitted that she did not know Ashley, Appellant, or the facts of the case; rather, her responsibility was to share general information about the nature of family violence.

6

In Issue One, Appellant contends Karr's expert testimony was inadmissible because it was not relevant.[6] Karr's testimony was not relevant, he argues, because she did not interview or have any contact with him or Ashley and did not have any specific knowledge of the facts of the case.

*Standard of Review*

We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion. *See Blasdell v. State*, 384 S.W.3d 824, 829 (Tex.Crim.App. 2012); *Tillman v. State,* 354 S.W.3d 425, 435 (Tex.Crim.App. 2011); *Ellison v. State,* 201 S.W.3d 714, 723 (Tex.Crim.App. 2006). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *See Blasdell*, 384 S.W.3d at 829; *Tillman,* 354 S.W.3d at 435; *Casey v. State,* 215 S.W.3d 870, 879 (Tex.Crim.App. 2007).

*Analysis*

The trial court did not abuse its discretion. First, an expert is not required to interview witnesses or to conduct an investigation of the facts for their testimony to be admissible. Rule of Evidence 703 allows an expert to base her opinion on facts or data "the expert has been made aware of[.]" TEX.R.EVID. 703. Accordingly, a trial court may not properly exclude an expert's testimony on the ground the expert did not interview witnesses or review the evidence before trial. *Tillman*, 354 S.W.3d at 439 (disapproving of any requirement that an expert's testimony be conditioned on the pretrial interview of witnesses or examination of the evidence as contrary to Rule 703); *Jordan v. State*, 928 S.W.2d 550, 556 n.8 (Tex.Crim.App. 1996) (same).

---

[6] Appellant also argues Karr's testimony was not reliable. At trial, Appellant objected only of the relevance of Karr's testimony, not its reliability. A complaint on appeal must comport with the objection at trial. *Bekendam v. State*, 441 S.W.3d 295, 300 (Tex.Crim.App. 2014); s*ee* TEX.R.APP.P. 33.1 (to preserve a complaint for appellate review, the record must show that "the complaint was made to the trial court"). Because Appellant did not object to the reliability of Karr's testimony at trial, we restrict our analysis to whether her testimony was relevant.

Second, "Texas courts have found expert testimony concerning the dynamics of domestic violence admissible as reliable and relevant under Rule of Evidence 702." *Pritchard v. State*, No. 14-12-00769-CR, 2014 WL 119003, at *2 (Tex.App. – Houston [14th Dist.] Jan. 14, 2014) (mem. op., not designated for publication), *judgm't vacated on other grounds*, 2014 WL 1512892 (Tex.Crim.App. April 16, 2014) (not designated for publication) (per curiam). General expert testimony on domestic violence is "both relevant and reliable" because it can, for instance, assist the jury in understanding why the complainant recanted her previous statement. *Id.* at *3; *see also Brewer v. State*, 370 S.W.3d 471, 474 (Tex.App. – Amarillo 2012, no pet.) (general expert testimony on domestic violence cycle admissible to assist the jury to understand the victim's delay in calling the police); *Dixon v. State*, 244 S.W.3d 472, 480 (Tex.App. – Houston [14th Dist.] 2007, pet. ref'd) (police officer trained and experienced in family violence could testify as expert on behavior of victims of family violence); *Capello v. State*, No. 03-05-00553-CR, 2006 WL 2453021, at *4 (Tex.App. – Austin Aug. 25, 2006, pet. ref'd) (mem. op., not designated for publication) (expert testimony on cycle of abuse relevant because it assisted jury in understanding why the victim initially lied to the police).

*Scugoza v. State*, 949 S.W.2d 360 (Tex.App. – San Antonio 1997, no pet.), is instructive in this regard. In *Scugoza*, the appellant contended the family violence expert's testimony was inadmissible because the expert had never been in contact with either the appellant or the victim. *Id.* at 363. The expert testified regarding the emotional and behavioral patterns that are typical of spousal abuse and explained why some victims eventually recant their accusations of abuse. *Id.* The expert did not purport to have any direct or personal knowledge regarding the victim or her family; rather he described the cycle of family violence and testified hypothetically that a victim

8

denying her initial accusation of abuse was consistent with the behavior of a typical battered woman. *Id.* This was a topic the average lay person was not familiar with, the court determined. *Id.* Accordingly, the expert's testimony was useful to the jury in discerning the victim's credibility by helping explain the inconsistencies between the victim's trial testimony and her previous report of abuse to law enforcement. *Id.* The expert's testimony "was both relevant and probative because it consisted of specialized information valuable in assisting the jury in understanding the evidence." *Id.*

Likewise in the present case, Karr's testimony was relevant and admissible expert testimony. Karr testified about the cycle of family violence, noting that the "whole cycle of violence is about power and control."[7] She described how victims of domestic violence often do not want to prosecute their abusers or testify about their abuse. She explained how various pressures, including those directly applied by the aggressor, can often cause a survivor to recant or deny the abuse ever occurred. As part of the intimidation and threats, an aggressor will often instruct a victim on what she should say regarding the abuse. In the end, more than half of survivors do not wish to prosecute.

Karr explained how economic dependence on the aggressor, an aggressor's control of family finances, and the aggressor's threats to children or family members are all factors that may compel a survivor to decide to stay with the aggressor. In some instances, aggressors will use isolation from friends and family to diminish and destroy the survivor's natural support system.

---

[7] The cycle of family violence commences with verbal and emotional abuse as a way to intimidate and lower the victim's self-esteem, and escalates into minor acts of violence to emotionally intimidate the victim into thinking that she will be a potential victim of physical aggression. This abuse often escalates into physical violence in the forms of shoving, pinching, or pushing, or other acts so severe that the victim is hospitalized. There will then be a "honeymoon period," a period of tranquility and calm when the aggressor apologizes for his acts and promises not to repeat his acts, before the violence escalates again. As the cycle continues, the honeymoon periods shorten and the periods of threats, intimidation, and violence lengthen and increase in duration and severity, sometimes resulting in homicide.

9

According to Karr, a person so isolated has difficulty raising a child alone, causing the mother to remain in a violent relationship thinking that she and the child will be safe if they stay together.

Both survivors and aggressors engage in minimizing and denying domestic abuse. For reasons of self-protection, survivors will often lie about the abuse they have suffered or will change their story regarding abuse, including offering alternative explanations for and minimizing signs of physical abuse.

Karr's testimony was relevant to understanding why Ashley recanted and denied Appellant's abusive and violent acts, as well as her desire to protect and remain with Appellant and her desire to protect Appellant from prosecution. Ashley minimized the severity of and gave alternative explanations for her injuries, as Karr testified victims of domestic violence sometimes do. Karr's testimony also aided the jury in understanding the interpersonal dynamics between Ashley and Appellant, which were evident in their recorded telephone conversation and ultimately from Ashley's testimony as a defense witness. Ashley – a young mother with only a ninth-grade education, no job, and children to support – testified in defense of Appellant, her aggressor, as domestic violence survivors sometimes do. Karr's testimony was relevant because it could assist the jury in understanding Ashley's actions and statements and in resolving the contradictions in her trial testimony. Accordingly, the trial court's decision to admit that testimony was within the zone of reasonable disagreement, and there was no abuse of discretion. Issue One is overruled.

**Motion for Mistrial**

In his second issue, Appellant complains the trial court erroneously denied his motion for mistrial after the State allegedly commented on his failure to testify during its closing argument at punishment. We conclude the State's argument did not rise to the level of a comment on

10

Appellant's failure to testify, and even if it did, the trial court did not abuse its discretion in denying a mistrial.

*Standard of Review*

A mistrial is an appropriate remedy in "extreme circumstances" for a narrow class of highly prejudicial and incurable errors. *Ocon v. State,* 284 S.W.3d 880, 884 (Tex.Crim.App. 2009). We review the denial of a mistrial for an abuse of discretion. *Id.* We must uphold the ruling if it was within the zone of reasonable disagreement. *Id.* In determining whether a trial court abused its discretion by denying a mistrial, we would balance three factors: (1) the severity of the misconduct (the magnitude of the prejudicial effect); (2) the effectiveness of the curative measures taken; and (3) the certainty of conviction or the punishment assessed absent the misconduct. *Hawkins v. State,* 135 S.W.3d 72, 77 (Tex.Crim.App. 2004); *Mosley v. State,* 983 S.W.2d 249, 259 (Tex.Crim.App. 1998).

*Background*

While Appellant did not testify during punishment, Ashley and several of Appellant's relatives and acquaintances did. Their testimony was essentially that Appellant was a good person, who needed treatment for anger management, drinking, and drug use, and who deserved leniency. No witness was asked, and no witness testified, whether Appellant had ever expressed or demonstrated remorse for his acts or a desire for rehabilitation. During closing argument during punishment, the State argued:

> Actions speak louder than words, ladies and gentlemen. You heard, on the witness stand, the family members. They talked about hope. I hope he gets help. I hope he gets better.
>
> But, ladies and gentlemen, hope without actions is hopeless. *You didn't see any actions from the defendant saying that he was sorry or that he wanted*

11

*rehabilitation.* (Emphasis added).

Appellant's counsel objected on the ground the State had commented on Appellant's failure to testify. The prosecutor, apparently recognizing that he had misspoken, attempted to clarify, "Your Honor, they saw nothing from the witnesses that show – [.]" Appellant's counsel requested an instruction to disregard. The State then asked for permission to rephrase the argument. Whereupon, the trial court instructed the jury:

> *I will instruct the jury that if that was a comment – it was a comment, I assume, from the prosecutor as to what the witnesses said, not from the defendant.* And you must very carefully follow the Court's instructions about the defendant's failure to testify, and you cannot hold that against him or draw any inference whatsoever about that failure [or] consider it . . . against him in any way. (Emphasis added).

After the trial court had denied Appellant's motion for mistrial, the State clarified its prior statement:

> Ladies and gentlemen, *you didn't hear from any of the witnesses. That's what I meant. You didn't hear from any of the witnesses that Mr. Mendoza was sorry or that he took responsibility.* They're family members. They do have hope. They love him. That's a good thing. That doesn't make this case better for him. That makes it worse. Because even though he has a support system, even though he has family members who love him, he still engages in bad behavior. (Emphasis added).

### *Analysis*

We first examine whether the State's closing argument improperly commented on Appellant's failure to testify. A comment on a defendant's failure to testify violates both the state and federal constitutions, as well as Texas statutory law.[8] *Randolph v. State*, 353 S.W.3d 887, 891 (Tex.Crim.App. 2011); *see also Moore v. State,* 849 S.W.2d 350, 351 (Tex.Crim.App. 1993).

---

[8] *See* TEX. CODE CRIM. PROC. ANN. art. 38.08 (West 2005) ("Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause.").

12

A comment on the defendant's silence at the punishment phase is improper even if the defendant testified during the guilt-innocence phase of trial. *Randolph*, 353 S.W.3d at 891. An implication that the State referred to the defendant's failure to testify must be both clear and necessary. *Id.* If the State's language might reasonably be construed as merely an implied or indirect allusion, no violation has occurred. *Id.* If another equally plausible explanation exists for the State's remark, we cannot find the prosecutor manifestly intended to comment on the defendant's failure to testify. *Id.* The test is whether the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify. *Id.* We must analyze the context in which the comment was made to determine whether the language used was of such character. *Id.* We view the State's argument from the jury's standpoint and resolve any ambiguities in the language in favor of it being a permissible argument. *Id.*

The State's comment was a mistake. If read in isolation, it could possibly be construed as a comment that Appellant failed to testify and demonstrate his remorse or desire for rehabilitation. However, we must consider the language in context and resolve any ambiguities in the language in favor of it being a permissible argument. In doing so, we conclude the context does not clearly and necessarily demonstrate that the State's language was manifestly intended as a comment on Appellant's failure to testify or was of such a character that the jury would necessarily and naturally consider it a comment on Appellant's failure to testify. Rather, the State's remark was preceded by and concluded with a summation of the testimony provided by the witnesses during punishment. Further, the trial court did not construe the statement as a comment on Appellant's failure to testify, and the prosecutor immediately informed the jury he was stating that they had not

13

heard from "the witnesses" about any actions by the defendant demonstrating remorse or a desire for rehabilitation.

However, even if we were to conclude that the State's comment was improper, the trial court did not err in denying Appellant's motion for mistrial. Regarding the severity of the alleged misconduct and its prejudicial effect, the record shows the State's comment was singular and brief, and comprised only a minor part of the State's closing argument on punishment. *See Hawkins*, 135 S.W.3d at 77. The State did not emphasize the comment. In fact, the prosecutor —apparently recognizing his mistake—immediately corrected himself and properly told the jury that he was referring to what they had not heard from the witnesses, not from defendant. Viewing the State's closing argument as a whole, we cannot conclude that there was a willful and calculated effort by the State to deprive Appellant of a fair and impartial trial. *See Brown v. State*, 270 S.W.3d 564, 572–73 (Tex.Crim.App. 2008) (in evaluating the severity of the misconduct, we assess whether the jury argument is extreme or manifestly improper by looking at the entire record of final arguments to determine if there was a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial).

Further, viewing the record as a whole, we cannot conclude that Appellant was prejudiced by the prosecutor's comment. When Appellant objected to the State's remark, the trial court swiftly applied curative measures. The court clarified that the State was referring to the failure of the witnesses, not defendant, to present evidence of remorse or rehabilitation. The court further instructed the jury that it was required to follow the court's prior instructions that Appellant's failure to testify must not be held against him, and reminded the jury that it was not permitted to draw any adverse inference from Appellant's failure to testify. *See Archie v. State*, 221 S.W.3d

14

695, 700 (Tex.Crim.App. 2007). A prompt instruction to disregard ordinarily cures any harm from improper argument. *Wesbrook v. State,* 29 S.W.3d 103, 115–16 (Tex.Crim.App. 2000); *Walker v. State*, No. 08-13-00239-CR, 2015 WL 1396043, at *5 (Tex.App. – El Paso Mar. 25, 2015, no pet. h.) (not designated for publication). And, on appeal, we generally presume the jury followed the trial court's instructions. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex.Crim.App. 2005).

Moreover, the prosecutor immediately corrected himself, thereby mitigating any harmful effect of his misstatement. *See Hawkins*, 135 S.W.3d at 84 ("Although a prosecutor's self-corrective action might not carry the same weight as a trial court's instruction to disregard, it is nevertheless a relevant consideration in determining harm and can, in the appropriate circumstances, render an improper comment harmless."); *see also Walker v. State*, No. 14-10-00389-CR, 2011 WL 977534, at *8 (Tex.App.–Houston [14th Dist.] March 22, 2011, pet. ref'd) (mem. op., not designated for publication) (prosecutor's misstatement of law concerning lesser-included offense harmless where prosecutor corrected herself).

And, the trial court had previously instructed the jury at the outset of closing arguments during punishment that they could not take into consideration that Appellant had elected not to testify.[9] Given this instruction, it is unlikely that Appellant could have been harmed by the prosecutor's comment. *See Hawkins*, 135 S.W.3d at 84 (discussing importance of fact that charge accurately instructed jury on the law); *see also Lee v. State*, 971 S.W.2d 130, 131–32 (Tex.App.–Houston [14th Dist.] 1998, pet. ref'd) (holding prosecutor's misstatement of burden of proof with

---

[9] "Our law provides that a defendant may testify in his own behalf if he elects to do so. This, however, is a privilege accorded a defendant, and in the event he elects not to testify, that fact cannot be taken as a circumstance against him. In this case the defendant has elected not to testify, and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against the defendant."

regard to lesser-included offense was harmless where charge accurately set out the law).

Prejudice is incurable only when the objectionable material is clearly calculated to inflame the minds of the jury or is of such a damaging character as to suggest it would be impossible to remove the harmful impression from the jurors' minds. *See Young v. State*, 283 S.W.3d 854, 878 (Tex.Crim.App. 2009); *Ladd v. State,* 3 S.W.3d 547, 567 (Tex.Crim.App. 1999). Because of the remedy's extreme nature, a mistrial "should be granted only when residual prejudice remains after objections are sustained and curative instructions given." *Barnett v. State,* 161 S.W.3d 128, 134 (Tex.App.– Fort Worth 2005), *aff'd*, 189 S.W.3d 272 (Tex.Crim.App. 2006); *see also Ocon,* 284 S.W.3d at 884–85. We conclude the State's comment, to the extent it was a comment on Appellant's failure to testify, was not incurable, and that any prejudice was cured by the trial court's prompt instructions as well as the prosecutor's clarification.

In considering the certainty of Appellant's punishment absent the misconduct, we note that Appellant was charged with two first-degree felony offenses, aggravated assault and aggravated kidnapping. The range of punishment for each of those offenses was imprisonment for life, or any term not less than five years and not more than 99 years. TEX. PENAL CODE ANN. §§ 12.32(a), 20.04(c), 22.02(b)(1)(West 2011). The State also alleged that Appellant had a prior, final felony conviction. The jury found this allegation to be true, thereby increasing the minimum punishment that could be assessed to fifteen years. TEX. PENAL CODE ANN. § 12.42(c)(1)(West Supp. 2014).

The jury assessed Appellant's punishment at seventeen years and six months for each crime, to be served concurrently. Thus, Appellant's sentence exceeded the minimum permitted punishment by only two and one-half years, when Appellant could have been sentenced to confinement for as long as 99 years or life. TEX. PENAL CODE ANN. §§ 12.32(a), 12.42(c)(1),

22.02(b)(1), 20.04(c).  Considering the evidence demonstrating the severity of Ashley's assault and injuries, her kidnapping into the desert, and other evidence admitted during both phases of trial, we have no doubt that the punishment assessed in this case would have been the same in the absence of the State's purported misconduct.

Given the brevity of the prosecutor's comment, the effectiveness of the curative instructions, the lack of prejudice, and the strength of the evidence supporting Appellant's sentence, we conclude the trial court did not abuse its discretion in denying Appellant's motion for mistrial.  Issue Two is overruled.

## Cumulative Error

In Issue Three, Appellant contends the cumulative effect of Karr's expert testimony, the State's purported comment on his failure to testify, and four other arguments made by the State at various stages of trial, combined to deny him a fair trial.[10]  We disagree.

We have already concluded that the trial court did not err in admitting Karr's testimony. We have also concluded that the State did not comment on Appellant's failure to testify.  Further, Appellant has not raised any separate issues in his brief contending that the trial court erred concerning the four other arguments on which he relies for cumulative error.  Nor has Appellant

---

[10] Appellant directs us to two arguments by the State in the guilt-innocence phase and two arguments at punishment. Appellant objected to a portion of the State's opening statement when the State attempted to explain why it could not call Ashley as a witness.  The trial court sustained the objection and instructed the jury to disregard.  Appellant also objected to the State's closing argument during guilt-innocence when the State argued that one of the reasons Ashley changed her story was her desire to show Appellant committed only the lesser offense of assault, which carries a lower maximum sentence.  The trial court sustained Appellant's objection and instructed the jury to disregard.  Appellant also points to the State's closing argument at punishment when the State mentioned Appellant had committed the additional crime of obstruction by spitting and threatening the arresting officers.  The State correctly notes Appellant did not object to that argument and thus waived any error.  *See* TEX.R.APP.P. 33.1(a)(1), (2).  Finally, Appellant objected to comments by the State that purportedly argued for punishment on extraneous crimes.  After the State countered that the jury was permitted to consider Appellant's prior bad acts in determining his punishment for the charged offenses, the trial court overruled the objection and directed the jury to refer to the charge and to determine a fair punishment.

presented any substantive argument in Issue Three demonstrating that the trial court had in fact erred in any respect as to those four arguments.

Cumulative error concerns performance of a harm analysis once multiple errors have been established. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex.Crim.App. 1999). Appellant has not established any errors, much less multiple errors. Consequently, there can be no cumulative error or harm. *See id.* ("no authority hold[s] that non-errors may in their cumulative effect cause error"); *see also Wyatt v. State*, 23 S.W.3d 18, 30 (Tex.Crim.App. 2000) (rejecting appellant's argument that cumulative effect of errors at trial denied him the right to a fair trial where the court had previously rejected each of appellant's individual arguments). We overrule Issue Three because there is no error to cumulate.

### Reformation of Error in the Judgment

The State has directed our attention to the trial court's judgment, which currently reflects the notation "N/A" regarding Appellant's plea and the jury's finding to the enhancement paragraph. The reporter's record, however, reveals that Appellant pleaded "not true" to the State's notice of enhancement, and that the jury made a "true" enhancement finding. An appellate court is authorized to reform or modify the judgment to conform to the record of the proceedings and to render an appropriate judgment, in accordance with its authority under Rule 43.2 of the Texas Rules of Appellant Procedure. *See French v. State*, 830 S.W.2d 607, 609 (Tex.Crim.App. 1992) (appellate court has authority to reform a judgment to include an affirmative finding to make the record speak the truth when the matter has been called to its attention by any source); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex.Crim.App. 1993) (appellate court has the power to modify incorrect judgments when the necessary data and information are

18

available to do so).   We therefore believe it is appropriate to modify the trial court's written judgment to reflect Appellant's plea of "not true" to the State's notice of enhancement, and the jury's "true" enhancement finding.   TEX.R.APP.P. 43.2(b).

## CONCLUSION

The trial court's judgment is affirmed as modified.


                                        STEVEN L. HUGHES, Justice

October 14, 2015

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Do Not Publish)